IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REMBRANDT PATENT INNOVATIONS LLC, and REMBRANDT SECURE COMPUTING, LP,<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | No. C 14-05094 WHA (lead)<br>No. C 14-05093 WHA (consolidated)<br><br>**ORDER ON CLAIM CONSTRUCTION AND CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

In this patent infringement action involving a secure boot sequence for a computer system, the parties seek construction of two related claim terms, defendant moves for summary judgment of non-infringement, and plaintiffs move to strike portions of defendant's expert's reply report and for partial summary judgment on defendant's invalidity counterclaim. For the reasons stated below, defendant's motion is **GRANTED**, and plaintiff's motion is **DENIED AS MOOT**.

**STATEMENT**

This action concerns the manner in which defendant Apple Inc.'s iPhone, iPad, and iPod Touch devices boot up. Plaintiffs Rembrandt Patent Innovations, LLC, and Rembrandt Secure Computing, LP (collectively, "Rembrandt") are non-practicing entities. Rembrandt Patent Innovations owns United States Patent No. 6,185,678, the sole patent asserted in this action.

Rembrandt Secure Computing is an exclusive licensee of the '678 patent and possesses the right to sue and recover for infringement thereof. Rembrandt acquired all rights to the '678 patent through a series of transactions with the inventors, the National Security Administration, and the University of Pennsylvania, all executed between 2011 and 2014.

The '678 patent is entitled "Secure and Reliable Bootstrap Architecture" and describes techniques for booting a computer system in a secure manner. The patented invention involves a "chain of integrity checks" beginning with the foundational layer of the computer system — certain important hardware and the Basic Input/Output System ("BIOS") — which is assumed to be secure. Relying on that assumption, once the computer is powered on, the BIOS verifies the integrity (that is, confirms it is safe to load) of the next layer in the boot sequence before passing control of the system to that layer (which repeats the process for the subsequent layer), a process referred to as "bootstrapping." Such integrity checks are generally performed using now-ubiquitous algorithms involving public-key cryptography and digital signatures, the details of which are unimportant for this motion. When integrity is verified at all layers, the operating system loads, and the user can be assured of the system's integrity (subject to the assumption of the integrity of the foundational layer).

The instant motion concerns how the invention handles integrity failures: "Once an integrity failure is detected, the invention uses a secure protocol to inform a trusted repository that a failure has occurred and to obtain a valid replacement component" ('678 patent col. 4:49–51). That is, the patented invention contemplates storing replacements for the various components of the boot sequence in a trusted location and using those backups to repair any integrity failures.

The disclosed bootstrapping process, including its recovery protocol, ensures integrity of a given operating system, but it "can also be utilized to reduce the Total Cost of Ownership (TCO) of a personal computer, through automatically detecting and repairing integrity failures," obviating the need for a "trouble call to support staff and the associated down time" ('678 patent, col. 4:60–65).

2

Neither the inventors nor Rembrandt ever developed a commercial product based on the '678 patent; however, the patent discloses various preferred embodiments in a system called AEGIS, intended to be used on the IBM PC architecture.

Rembrandt accuses Apple's iPhone, iPad, and iPod Touch products of infringing claims 1, 3, 4, and 7 of the '678 patent. Independent claim 1 reads (*id.*, cols. 21:39–22:11):

> An architecture for initializing a computer system comprising:
>
> > a processor;
> >
> > an expansion bus coupled to said processor;
> >
> > a memory coupled to said expansion bus, said memory storing a system BIOS for execution by said processor upon power up of the computer system;
> >
> > a plurality of boot components coupled to said expansion bus and accessed by said processor when said system BIOS is executed;
> >
> > a trusted repository coupled to said expansion bus; and
> >
> > means for verifying the integrity of said boot components and said system BIOS wherein integrity failures are recovered through said trusted repository.

Claim 3 depends from claim 1 and reads (*id.*, col. 22:15–19):

> An architecture for initializing a computer system according to claim 1, wherein said trusted repository is a host computer communicating with said computer system through a communications interface coupled to said expansion bus.

Independent claim 4 reads (*id.*, col. 22:20–26):

> A method for initializing a computer system comprising the steps of:
>
> > (1) invoking a Power on Self Test (POST);
> >
> > (2) verifying the integrity of a system BIOS;
> >
> > (3) verifying the integrity of a boot component; and
> >
> > (4) when said boot component fails, recovering said failed boot component.

3

Claim 7 depends from claim 4 and reads (*id.*, col. 22:37–40):

> The method of claim 4, wherein step (4) employs a secure protocol to obtain a replacement boot component from a trusted repository to replace said failed boot component.

The accused products are consumer mobile computing devices that run various versions of Apple's operating system for mobile devices, iOS. Rembrandt accuses every version of the iPhone, iPad, and iPod Touch and every version of iOS released through September 2015.[*]

Apple's products all use a chain of integrity checks upon booting. The similarities and differences between Apple's boot sequence and that of the '678 patent need not be addressed here. The key issue is how Apple's products recover upon an integrity failure.

Depending on which boot component caused an integrity failure, the accused products enter one of two modes reflecting the failure without any user interaction. The first is "Device Firmware Update" mode, and the second is "Recovery Mode." In either mode, a device can recover if it is connected to a computer that runs Apple's desktop software, iTunes. Once connected, iTunes is able to replace or repair the errant component; however, the user must affirmatively click a button to start the recovery process. If the user chooses to proceed with recovery, iTunes connects to a server maintained by Apple based on a network address hard-coded into the iTunes source code and retrieves information about the location of the desired replacement component. iTunes then uses that information to download the desired component. It then verifies the component, and if its integrity is verified, the component is loaded onto the device, and recovery is completed (Tygar Rpt. ¶¶ 112–24).

A user's decision to forego or postpone the process will leave the phone "bricked," that is, useless until recovery can occur. A user may elect to leave the phone in that state in order to wait until it can be brought to an Apple store in the hopes that alternative recovery procedures

---

[*] As this case progressed, the parties stipulated to five successive amendments to Rembrandt's infringement contentions, each time adding a set of newly-released Apple products. This action, therefore, concerns twenty-five accused products in the three product categories identified above. An order denied Rembrandt's motion to amend its infringement contentions a sixth time, the first such amendment that Apple opposed, which would have expanded the case to include four new hardware products and a new operating system, all released in fall of 2015 (Dkt. No. 130).

4

1  available at the store might not require erasing the data on the phone (while recovery via iTunes
2  will generally erase data). Once the user approves of the recovery, it proceeds without further
3  human interaction (Tygar Rpt. ¶¶ 439–42, 454).

4  Rembrandt commenced the first of two now-consolidated actions in the Eastern District
5  of Texas in January 2014. The actions were transferred to the District Court here in San
6  Francisco in November 2014 and subsequently consolidated. Apple now moves for summary
7  judgment of non-infringement, and Rembrandt moves for partial summary judgment on Apple's
8  counterclaim and defense of anticipation and obviousness. This order follows full briefing, a
9  ninety-minute tutorial explaining the technology, and oral argument on the motions.

**ANALYSIS**

Apple moves for summary judgment on all claims based on the theory that the construction of two related claim terms will be dispositive. Rembrandt moves to strike portions of Apple's expert's reply report and moves for partial summary judgment on Apple's anticipation and obviousness claims based on that motion to strike.

This order begins with Apple's motion. A claim for infringement (or non-infringement) involves two steps. The first step is to construe the claims, which this order does only to the extent necessary to resolve the instant motions. The second step is to compare the properly construed claims to the accused device.

**1.    CLAIM CONSTRUCTION.**

Apple's motion for summary judgment turns on the construction of two related claim terms, namely, the meaning of "recovered" in claim 1 (and dependent claim 3) and "recovering" in claim 4 (and dependent claim 7). The parties' proposed constructions are set forth below:

5

| **Terms & Claims** | **Apple** | **Rembrandt** |
|---|---|---|
| "Wherein integrity failures are recovered through said trusted repository." (Claims 1 and 3) | "wherein replacement components are automatically obtained from a trusted repository." | "wherein replacement components are obtained from a trusted repository." |
| "when said boot component fails, recovering said failed boot component . . . to replace said failed boot component." (Claims 4 and 7) | "at the time boot component fails its integrity verification, automatically recovering said failed boot component . . . automatically replacing said failed boot component." | "when said boot component fails its integrity verification, recovering said boot component . . . to replace said boot component that failed its integrity verification." |

The critical claim construction dispute here is whether the recovery element of the claims requires *automatic* recovery, that is, recovery without human intervention. Apple contends that when read in light of the specification, it is clear that a person of skill in the art would understand that the invention required automatic recovery. Rembrandt argues that the absence of any reference to automation in the claim language precludes such a limitation and that such a limitation may only be found by impermissibly importing the limitation from the specification.

To determine the proper meaning of a disputed claim term, we first look to the intrinsic evidence, that is, the record before the USPTO, the prior art, and the specification of the patent itself. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (*en banc*). Although the claims themselves define the scope of the patent, they must be read in the context of the entire patent, including the specification, which is "the single best guide to the meaning of a disputed term." *Id.* at 1315. Nevertheless, we must "avoid the danger of reading limitations from the specification into the claim." *Id.* at 1323. "In order to avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so." *Ibid.*

6

Generally, the words of a claim are to be given their ordinary and customary meaning as understood by a person of ordinary skill in the art at the time of the invention, with two exceptions: "(1) when a patentee sets out a definition and acts as his own lexicographer, or (2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't. Am., LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citations omitted). In some cases, "the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance . . . the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Phillips*, 415 F.3d at 1316. Such a disclaimer need not be expressly made. *See Trustees of Columbia Univ. in the City of New York v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) (rejecting argument that a patentee must expressly define a term or expressly disclaim the full scope of a claim term).

Indeed, the Federal Circuit recently acknowledged a trend of decisions in which it found "disavowal or disclaimer based on clear and unmistakable statements by the patentee that limit the claims, such as 'the present invention includes . . .' or 'the present invention is . . .' or 'all embodiments of the present invention are . . . .'" *GE Lighting Solutions., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014), rehearing denied (June 17, 2014) (citing *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013); *Honeywell Intern., Inc. v. ITT Indus.*, Inc., 452 F.3d 1312, 1316–19 (Fed. Cir. 2006); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001)).

From the very outset — in the description of the field of the invention — the patent contemplates an automated recovery procedure: "This invention relates to an architecture for initializing a computer system and more particularly to a secure bootstrap process and *automated* recovery procedure" ('678 patent, col. 1:23–25) (emphasis added).

Moreover, the patent criticizes the prior art as flawed because it relied on human interaction in order to recover (*id.*, col. 3:42–59) (emphasis added):

> Previous efforts to provide recovery of bootstrap components have required *human interaction*, typically to insert a floppy disk containing the new component or to boot from a floppy disk. There are several reasons why this recovery method is inferior to the present invention. The first is that providing physical security for the floppy disk is extremely difficult. Users can take the disks wherever they like, and do whatever they like to them. The major shortcoming, however, in only using a boot disk is that none of the firmware is verified prior to use. Thus, a user can add or replace expansion boards into the system without any security controls, potentially introducing unauthorized expansion cards. Additionally, these efforts have only focused on repairing a single component of the entire process, i.e., only repairing the boot block, or the BIOS but not both. *This is in contrast to the present invention which provides automatic recovery* of all of the bootstrap components including ROM chips.

The patent further notes, in the summary of the invention (*id.*, col. 4:60–65) (emphasis added):

> The present invention can also be utilized to reduce the Total Cost of Ownership (TCO) of a personal computer through *automatically* detecting and repairing integrity failures, thereby permitting the user to continue to work without the nuisance of a trouble call to support staff and the associated down time.

This advantage of the patented invention is echoed again in the description of the preferred embodiment, which states (*id.*, col. 20:45–48) (emphasis added):

> *Automatically* detecting and repairing integrity failures permits the user to continue to work without the nuisance of a trouble call to the support staff and the associated down time spent waiting.

Moreover, the description of the recovery process of the preferred embodiments *twice* states "[t]his entire process occurs without user intervention" (*id.*, cols. 6:25, 10:8).

References to automatic recovery pervade the patent. There is not a single reference to recovery with human intervention.

Rembrandt does not engage with the above-cited authority directing us to interpret claim terms in light of the specification and implicit disclaimers therein. Instead, it stands on the principle that "[i]t is the *claims* that measure the invention," not the specification. *SRI Intern. v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (*en banc*). The above-cited authority is not at odds with that principle. As stated, the specification provides the best means for understanding the meaning of the claim terms. This order does not simply

8

1 import a claim limitation from the specification, but rather holds that the inventors intended for
2 their invention to include an automatic recovery process, which was superior to a process
3 involving human intervention.

4 At oral argument, counsel for Rembrandt contended that the description of the prior art
5 that "required human interaction" cited above only disclaimed recovery using a *floppy disk*, not
6 all recovery requiring human interaction. The specification simply does not support that
7 reading. The prior art is described as requiring human interaction; the floppy disk is just one
8 typical example of a means for recovery with human intervention. Counsel also argued that the
9 floppy disk example served to distinguish a process that only recovers one component at a time,
10 while the patented invention could recover all failed components at once, but that is only *one* of
11 the problems with the prior art solved by the patented invention. Other problems, such as the
12 down time associated with requiring human intervention, could only be solved with an entirely
13 automatic recovery process. Rembrandt's attempt to limit the scope of the disclaimer in the
14 specification is unpersuasive.

15 Rembrandt also contends that a genuine dispute of fact exists because its expert asserts
16 that he would not have understood the term "recovery" to be limited to "automatic recovery"
17 (Tygar Rebuttal Rpt. ¶ 42). "Legal error arises when a court relies on extrinsic evidence that
18 contradicts the intrinsic record." *Ruckus Wireless, Inc. v. Innovative Wireless Solutions*,
19 Nos. 2015-1425, 2015-1438, 2016 WL 3065024 (Fed. Cir. May 31, 2016) (citations omitted).
20 This order declines Rembrandt's invitation to make such an error.

21 Rembrandt also argues that the patent discloses examples of manual recovery, but its
22 examples are strained at best. Rembrandt cites the abstract of the patent, which notes "the
23 bootstrap process of the present invention *can* be augmented with automated recovery
24 procedures" (emphasis added). Rembrandt contends the use of the word "can" implies that
25 automated recovery is not a necessary element of the invention. Reviewed in the context of the
26 abstract, however, the sentence referenced does not relate to an augmentation *to the invention*,
27 rather, it is a description of the invention itself:

28

9

> The basic principle is sequencing the bootstrap process as a chain of progressively higher levels of abstraction, and requiring each layer to check a digital signature of the next layer before control is passed to it. A major design decision is the consequence of a failed integrity check. A simplistic strategy is to simply halt the bootstrap process. However, the bootstrap process of the present invention can be augmented with automated recovery procedures which preserve the security properties of the bootstrap process of the present invention under the additional assumption of the availability of a trusted repository.

The sentences preceding the reference to automated recovery describe the bootstrap process aspect of the invention, and the problem encountered when an integrity check fails. The abstract then pivots from discussion of the bootstrapping elements of the invention toward the recovery component, thereby addressing the issue of failed integrity checks. Notably, that pivot is the first time recovery is mentioned anywhere in the patent. Thus, if the word "can" in the abstract were read to present an *option* of augmenting with automated recovery, there would be no recovery protocol at all, negating that claim element. This order rejects Rembrandt's proffered interpretation of the abstract.

Rembrandt makes a similar argument based on the statement in the specification that "[t]he present invention *can also* be utilized to reduce the Total Cost of Ownership (TCO) of a personal computer through automatically detecting and repairing integrity failures" ('678 patent col. 4:60–62) (emphasis added). The words "can also" in that sentence, however, are plainly intended to disclose the fact that the automatic recovery aspect of the invention can also reduce the total cost of ownership. It does not offer automatic recovery as an *optional* component of the invention. Again, Rembrandt's attempt to strain the language of the specification to fit its interpretation fails.

Rembrandt also points to a discussion of a preferred embodiment that contemplates resorting to a user policy upon an integrity failure, which might include human interaction (*id.*, col. 10:21–25) (emphasis added):

> Should a trusted repository be unavailable *after several attempts*, then the client's further action depends on the security policy of the user. For instance a user may choose to continue operation in a limited manner or may choose to halt operations altogether.

10

1  The user policy, however, is only reached if a trusted repository is unavailable "after several

2  attempts." That is, we only ever reach the need for human intervention *if the invention fails*,

3  *i.e.*, the automatic recovery fails. Moreover, the options available as part of that user policy do

4  not include recovery but are rather limited to continuing operation in a limited manner or

5  halting operations altogether. That embodiment simply cannot be read to enable a system that

6  requires human intervention to recover.

Another embodiment provides for the intervention of a system administrator (*id.*, col. 20:48–53):

> A system administrator can monitor the log of the AEGIS trusted repository and identify the workstations that require "hands on" repairs, e.g., ROM failure, and schedule the work to be done when the user is not using the computer.

Again, the system administrator would only intervene once the system has contacted the trusted repository, automatically recovered (such that the user could continue to use the computer), and the log indicated that additional repairs must be done (although, again, the system *has* recovered).

Finally, Rembrandt points to a proposed use of the invention in which a system administrator can limit the validity time period of a given component, causing the system to contact the trusted repository on a set schedule to check for updates that might be placed there by the administrator. The manual intervention described in that embodiment, however, relates to the centralized management of updates and maintenance of the trusted repository. It does not disclose manual recovery from integrity failures. Indeed, the specification still describes the actual *update* process as occurring "automatically" (*id.*, col. 5:3–14) (emphasis added).

If Rembrandt's construction were to win the day, Rembrandt's failure to disclose an embodiment of the claimed invention involving a manual recovery process might render the claims invalid under Section 112. Claims "should be construed to preserve their validity." *Phillips*, 415 F.3d at 1368. This order finds a proper reading of the specification requires that the claim terms "recovered" and "recovering" must be qualified with the word "automatically,"

11

1  but the possibility that Rembrandt's construction would render the patent invalid lends further
2  support to Apple's proposed construction.

3  In *Honeywell International, Inc. v. ITT Industries, Inc.*, 452 F.3d 1312, 1318 (Fed. Cir.
4  2006), the Federal Circuit noted "[t]he public is entitled to take the patentee at his word and the
5  word was that the invention is [as described in the specification]." So too here. This order
6  takes the patentees at their word that "this invention relates to . . . a secure bootstrap process
7  and *automated* recovery procedure" ('678 patent, col. 1:23–25) (emphasis added).

### 2. NO LITERAL INFRINGEMENT.

Having construed the disputed claim term, we now turn to the accused products. Apple contends that because the accused products require human intervention to recover, they cannot infringe the asserted claims. Rembrandt responds that Apple's products *do* recover automatically *once the user has plugged the device into a computer and affirmatively initiated the recovery process* and because the devices *enter* "recovery mode" automatically (although, again, they cannot *recover* without human interaction). Rembrandt's argument seeks a second bite at claim construction by trying to ignore the automatic limitation. Automatic recovery simply cannot mean recovery started manually, even if the technical restoration of a new component is ultimately performed automatically (after a human has commenced the process). Indeed, the very language from the specification cited above plainly contemplates a recovery process that begins, proceeds, and finishes without user intervention. Further, the patent distinguishes a process (booting from a floppy disk) that must be *begun* manually, although it proceeds automatically once initiated.

True, the specification identifies certain circumstances in which human interaction may be necessary to recover a device, but, again, those circumstances are clearly limited to instances when several attempts at automatic recovery have *failed*, and in fact, they do not provide for recovery at all. Tellingly, no claim element reads on these instances of human interaction. Rather, they are merely demonstrations that when the invention malfunctions, the system is not irrevocably compromised.

Because the accused devices required human interaction to initiate the recovery process in the accused device, this order holds that the accused devices lacked an automatic recovery procedure, as required by each of the asserted claims.

### 3. NO EQUIVALENT INFRINGEMENT.

Rembrandt also contends that the accused products infringe under the doctrine of equivalents, which provides that "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950).

Rembrandt argues that Apple's recovery process still infringes because each accused device automatically detects a recovery failure and enters recovery mode. Then, once the user has plugged in the device and chosen to start the recovery process, the process continues automatically without human intervention. Because the user never has the opportunity to supply an unsecured component, the accused devices are assured a secure recovery, subject to the user's decision to plug in the device and initiate recovery. Contrary to Rembrandt, this cannot be read to recover a component that experienced an integrity failure "in the same way" as the patented invention.

The specification acknowledged that the invention's use of an automatic recovery process was intended to eliminate the possibility that a user would misplace a backup component, the possibility that he would install unsecured components, and the frustration and cost of making a service call and the intervening denial of service. It did so by removing the need for human intervention at all, namely, with automatic recovery. By contrast, the accused products require human interaction in order to recover, and as a result, some of the problems sought to be solved by the patented invention persist.

For example, it is undisputed that the accused products are "bricked" from the time they enter recovery mode until they are recovered, so a user will still experience a denial of service until he is able to reach a computer running iTunes or go to an iTunes store. Additionally, even

13

if remote, the possibility that the user would mistakenly uninstall or disable iTunes from his computer persists. Finally, a user that seeks to recover his or her device *without* erasing his or her data must still endure the cost of a call or visit to the Apple store. Thus, by adopting a different solution to one of the problems addressed by the patented invention, namely, assuring a secure recovery can occur for all compromised boot components, Apple forewent the solutions to other problems also addressed by the automatic recovery element of the invention. This can hardly constitute performance of the same function in the same manner.

The Federal Circuit rejected an argument similar to Rembrandt's in *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000), rehearing denied (Nov. 27, 2000). There, the patent owner claimed that the use of an adhesive strip on accused mailing forms that extended "about 48%" of the length of the margins of the mailer was equivalent to a claim that required materials to extend the "majority of the lengths" of the margins. That decision held that the patent owner's theory of equivalents would vitiate the "majority" claim limitation. If majority and minority were equivalent, the limitation would be unnecessary. Moreover, it held that no reasonable juror could find that "a minority — the very antithesis of a majority — could be insubstantially different from a claim limitation requiring a majority . . . ." *Ibid.*

Nor here. If Apple's recovery procedure that required human intervention could be equivalent to automatic recovery even though the former failed to address all of the problems solved by the latter, that would vitiate the automatic limitation present in the properly construed claims. Plainly, the inventors did not view these as equivalent when they expressly described previous efforts that required human interaction as "inferior to the present invention" ('678 patent, col. 3:43–47).

Rembrandt also argues that the recovery process on the accused devices is equivalent to the embodiments in the patent that present a user with a choice when a trusted repository is unavailable. Rembrandt ignores, however, the fact that the embodiments only present a user

14

choice *after several failed attempts* at automatic recovery, and moreover, that the user's choices presented *do not include recovery*.

Thus, this order holds Apple's products do not infringe under the doctrine of equivalents.

### 4. OTHER ISSUES.

Because this order holds that Apple is entitled to summary judgment, it need not address Apple's alternative arguments, namely, that it does not directly infringe because it does not sell its products tethered to a computer running iTunes, that it could not have acted willfully, and that it is not liable for extraterritorial damages under Section 271(f) for supplying a component from the United States for incorporation into an infringing product abroad.

This order also need not address Rembrandt's motion to strike portions of Apple's expert's reply report and to grant summary judgment that claims 1 and 3 are not anticipated or obvious in light of the "corresponding structures" identified in that reply report. Although Apple brings a counterclaim for declaratory judgment of invalidity, the district court has discretion to dismiss invalidity counterclaims after granting summary judgment that there is no literal or equivalent infringement, as here. *Nystrom v. TREX Co., Inc.*, 339 F.3d 1347, 1351 (Fed. Cir. 2003). The undersigned so exercises that discretion and dismisses Apple's counterclaim without prejudice.

### CONCLUSION

To the extent stated above, Apple's motion for summary judgment of non-infringement is **GRANTED**. This order dismisses Apple's counterclaim for invalidity, and accordingly, Rembrandt's motion to strike Apple's expert's reply report and its motion for partial summary judgment is **DENIED AS MOOT**. Final judgment will follow.

**IT IS SO ORDERED.**

Dated: June 10, 2016.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

15